## THE COGNE.

## THE VALTELLINA.

District Court, E. D. Virginia. June 17, 1927.

**I. Shipping ⊂⇒38—Under charter party, vessel could cancel it, when for specified cause charterer failed to deliver part of cargo for six running days after free time.**

Under charter party providing for loading at a specified average rate per day, commencing a certain number of hours after steamer reports ready, any time lost through any of enumerated causes, including embargo on railway, not to be considered part of loading time, and that, in event of any "stoppage" arising from any of these causes continuing for six running days from time of vessel being ready to load, the charter shall become void, held, that the vessel had right to cancel the charter when, by reason of embargo on railway, though not continuing there for six consecutive days, there was a failure of charterer to deliver any part of the cargo for a period of six running days after the ship reported ready and free time expired.

**2. Shipping ⊂⇒38—Vessel held not entitled to cancel charter for failure of charterer to seasonably deliver all of cargo, in view of his loading offer.**

Though charter party, providing that any time lost through any of enumerated causes, including embargo on railway, should not be computed as part of loading time, further provided that, in event of any stoppage arising from any of these causes continuing for a period of six running days from time of vessel being ready to load, the charter party shall become void, held, that where, before expiration of the six days and before cancellation notice was served by ship's master, charterer had accumulated part of cargo, and had offered to partially load the vessel at his expense, which offer, if accepted, would have resulted, on the ship receiving part cargo, in further delay being on demurrage, refusal of the offer was a breach of the contract.

In Admiralty. Two libels by the Consolidated Coal Company, Incorporated, one against the Italian steamship Cogne and Societa Commercial di Nav, and the other against the Italian steamship Valtellina and Societa Commercial di Nav. Decrees for libelant.

Baird, White & Lanning, of Norfolk, Va., for libelant.

Hughes, Vandeventer & Eggleston, of Norfolk, Va., for respondent.

GRONER, District Judge. The essential facts in each of the above cases are the same. Such differences as exist relate to the quantity of coal to be carried, the dates of arrival and cancellation, and other inconsequential matters.

Both steamers had been chartered to carry a full cargo of coal from Newport News abroad. The form of charter party used was the same in each case. The free time allowed in the case of the Cogne was 48 hours, and in the case of the Valtellina 72 hours. At the time the vessels reported ready to load, the coal intended to be shipped had not reached the piers, and most of it had not been delivered to the railroad at the mines. The result was that each vessel was delayed more than "six running days" from the time she reported ready to load, and thereafter in each case a notice of cancellation was given by the master of the vessel, and the object of these suits is to test the validity of the cancellations and, if the cancellations be held invalid, to recover the damages resulting therefrom. Inasmuch as this is intended to be merely a memorandum of my views on the legal question on which the case turns, I shall not set out the facts, except as they are necessary to an understanding of that question.

In the case of the Cogne a very abbreviated statement of the facts is as follows: The steamer arrived and gave notice of readiness to load 12 noon, September 30th. The charter provided for 48 hours free time, which, therefore, expired at noon October 2d (Saturday). She should have received her full cargo in 4 days 4 hours and 48 minutes; but, as no cargo was to be loaded after 5 p. m. on Saturday to 7 a. m. on Monday, loading time would not have expired until about 7 a. m. Friday, October 8th. On October 1st, the charterer notified the master of "various embargoes on the Chesapeake & Ohio Railway, occasioning considerable delay in the shipment and movement of nominated coal to loading pier at Newport News and consequent delay to your vessel." On October 5th, charterer notified the master more in detail as to the embargoes and more fully as to the shipment of coal to be loaded into his vessel, and informed him that there were then in process of transportation 95 cars, containing 4,523 tons. On October 6th, the master advised the charterer that demurrage would begin at 8 a. m. October 8th.

On October 9th, charterer advised the master by letter as follows: "Referring to charter party dated New York September 3, 1926, we have on hand at Newport News sixty-six (66) cars of the coal shipped for your vessel, which we beg to tender for immediate loading. Balance of the cargo is now in transit and should be available for loading within the next several days. If you elect to permit loading of the above-mentioned sixty-six (66) cars, we will arrange for prompt berth at the pier of the Chesapeake & Ohio Railway Company and, after same has been loaded, return your vessel to the stream to await arrival of the balance."

To this communication the master replied in writing the same day: "This is to advise that I will not agree for my vessel to go alongside the coal piers unless you guarantee that all the coal is available for her and that loading will be continuous until full cargo is on board." And on October 11th the master in a further written communication to charterer stated: "As my vessel was tendered to you at 1 p. m. September 30th, and has been delayed by embargoes placed by the Chesapeake & Ohio Railway Company for six running days, I hereby cancel my charter, effective 7 a. m., October 11, 1926, which is in accordance with clause 3 of the charter party. The charter is therefore null and void."

In the case of the Valtellina, this vessel reported ready October 8th. The charter provided 72 hours free time, which (Sunday intervening) expired Monday, the 11th, at 3 p. m. Loading time was 5 days 5 hours and 6 minutes, which (excluding Sunday) would expire 10:06 Monday, the 18th. On the 9th, charterer notified the master of "various embargoes on the Chesapeake & Ohio Railway Company occasioning considerable delay in the shipment and movement of nominated coal to loading pier at Newport News and consequent delay to your vessel."

On the 15th of October, the charterer delivered the following written communication to the master: "We hereby tender for loading about 40 cars of coal now on hand at Newport News, shipped for your vessel, and have asked the Chesapeake & Ohio Railway Company to provide prompt berth in order that steamer may go alongside and load this coal. It is understood that any extra expenses incurred in connection with the docking and undocking, to dump these 40 cars, to be for our account."

On the same day the charterer canceled the original registry at the railway pier and re-registered her for 1,700 tons. The railroad company accepted the new registry and on October 16th sent a tug to the vessel for the purpose of bringing her into dock, but the master refused to allow his vessel to be brought in or to accept partial load and that day canceled the contract.

As the case turns upon the interpretation of paragraph 3 of the charter party, I set it out substantially in full:

"The cargo to be loaded into steamer at

not less than the average rate of 1,400 tons per running day * * * commencing 72 hours after steamer tenders and written notice is given of the steamer being * . * * ready to load. * * * Any time lost through riots, strikes, lockouts, or any dispute between masters and men occasioning a stoppage of pitmen, trimmers, or other hands connected with the working or delivery of the coal for which the steamer is stemmed, or by reason of accidents to mines or machinery, *obstructions, embargo or delay on the Railway or at the loading piers, * * * or any other cause beyond the control of the charterers, not to be computed as part of the loading time (unless any cargo be actually loaded during such time). In the event of any stoppage or stoppages arising from any of these causes continuing for the period of six running days from the time of the vessel being ready to load, this charter shall become null and void: Provided, however, that no cargo shall have been loaded on board the steamer previous to such stoppage or stoppages."*

[1] The position of the parties respectively as to this paragraph is, as to the libelant, that while it is entitled to deduct all of the different days on which its coal was embargoed and to be liable for no demurrage by reason of the delay to the ship incident thereto, the ship is not entitled to a cancellation of the contract unless such embargo was in effect for six consecutive days, even though the embargo for less than six consecutive days resulted in an actual delay of delivery of coal to the vessel for six or more consecutive days. The position of the vessel is, of course, the reverse of this, namely, that if, as a result of an embargo, there is delay in delivery of coal to it for six consecutive days, the option to cancel arises.

Two cases are cited which bear upon the question. One is an English case, The Larrinaga, of which I have been furnished with a typewritten copy of what purports to be the opinion of the English court delivered by the Master of the Rolls, Sir Ernest Pollock. The charter party there construed appears to be identical with that in issue here, except that here, and not there, the words "embargo or delay on the railway or at the loading piers" is included in the excepted causes. In the English case the vessel was delayed by reason of a strike of switching crews employed by the railway for work at and on the piers, the result of which was that, though the coal intended for the vessel was at hand, it could not be brought to the ship's side. The strike did not completely tie up the op-

eration of the piers, but reduced it to about 25 per cent. of normal, which caused delay in docking the vessel in excess of six running days. In that case the charterer undertook to cancel, and the court held that the cancellation was illegal, on the ground that the words "stoppage or stoppages" meant complete stoppage, and not partial stoppage, and, since some work at the piers was in progress, the clause was not effective.

The other case cited is United States v. Kemmerer (C. C. A. Third Circuit) 7 F. (2d) 187. In it the United States sought to recover demurrage on a Shipping Board vessel chartered to receive a cargo at Philadelphia. The vessel reported ready, but owing to ice in the river, and congestion of steamers caused thereby, she was delayed in the stream for several days, for which delay the United States claimed demurrage. The court held neither party in fault, the charterer having the coal ready at hand, and the vessel being also ready, and the cause of the delay being the obstructing ice, which the court held was one of the agreed exceptions and relieved the charterer of the payment of demurrage. The part of the opinion which, while obiter, is *most in point, is that in which it is declared that under the six-day cancellation provision —the same there as here—the vessel had the right, after arriving and reporting on January 27 and finding itself absolutely balked by ice for the six ensuing days, then and there to throw up the charter and avoid further delay.*

While I have given due consideration to the opinions in these cases, I regard neither of them as controlling and neither as directly in point. As a general principle, it may be said that the evidence to justify one of the parties in setting aside a contract should be clear and unequivocal, and the contract itself should be upheld by the court, rather than avoided, if the ordinary interpretation of the language used will permit of that result. The parties, however, may make such contract as they please, and the point is to give effect to their intention, and this must be done by recourse to the language used.

Applying this rule, it seems clear that the portion of paragraph 3 emphasized above was intended to protect the parties respectively against conditions which could not be foreseen at the time of making the contract, or thereafter avoided in the exercise of due care; that is to say, the charterer should not be required to pay demurrage in the event his inability to load the vessel with the stipulated cargo was due to some one or more of those causes specifically excepted, and, on

the other hand, the shipowner should not be required to keep his vessel waiting without pay, after she had reported ready, beyond the stipulated six days. In other words, the exception, though in its terms, as between the charterer and the ship, somewhat different, is in effect reciprocal in its operation, and may not be claimed by the one and denied to the other.

The admitted facts in this case show that there was an "embargo on the railway," and that as a result the charterer's coal was accepted for shipment by the railroad at irregular periods, and equally as a result did not reach the piers in sufficient quantity to load the vessel until after the expiration of the six running day period. The fact of the embargo and its consequences had the effect, by the terms of the charter party, of relieving the charterer of the obligation to pay demurrage. Did it also, when it delayed the vessel six days, have the further effect of releasing the vessel? Of course, if the word "stoppage," as used in the charter party, means only complete stoppage, the exception would not be available to the ship, because admittedly the charterer did have during the ordinary loading period of the vessel some coal on hand; but to adopt that construction of the document would be effectively to deny a purpose of affording protection to the vessel against uncompensated delay, because delivery to the pier of a single car a day, an operation which would prolong the loading of the vessel indefinitely, would be all that was necessary to render the exception innocuous.

Ordinarily the word "stoppage" means an obstruction or hindrance to the doing of a particular thing, and, if that interpretation be applied here, then, as used in the charter party, the particular thing the parties had in mind was the delivery of the cargo to the ship, and the particular thing to be avoided the indefinite delay of the ship without cargo. Any obstruction or hindrance, therefore, which prevented the charterer from making delivery or the ship from receiving cargo, if arising out of one of the excepted causes, brought the exception into operation. It must, I think, have been in contemplation of the parties in the use of the language mentioned that it would be understood to include a right on part of the ship to cancel the contract whenever, by reason of an embargo on the railway, the charterer was prevented by that hindrance or obstruction for six consecutive days in making delivery of the cargo, and it could not, I think, have been intended to mean that the obstruction or hindrance by embargo on the railway must continue *there* for six consecutive days, because, obviously, under such circumstances, the relief to the charterer from the payment of demurrage would have been complete; whereas, the delay to the ship without pay for her lost time might have been continued almost indefinitely, and this negatives any idea of reciprocal rights, which, as I have already stated, I believe it was the purpose of the charter party to secure, and I am therefore constrained to hold that the correct interpretation of paragraph 3 gave the vessel the right to cancel the charter whenever, by reason of one of the causes mentioned in the paragraph, there was failure on the part of the charterer to deliver any part of the cargo for a period of six running days after the ship reported ready and free time expired.

[2] If this were all, I should be constrained to hold the cancellation valid; but there is in each case another factor which impels a contrary conclusion, for in each case it appears from the evidence that before the expiration of the six days, and before the cancellation notice was served, the charterer in the case of the Cogne had then accumulated 60-odd cars of coal, and in the case of the Valtellina 40 cars of coal, at the pier, and offered in each instance to partially load the vessel at its expense, and this request the masters of the vessels refused. If the offer had been accepted, under the terms of the charter party, the vessel, having received part cargo, would as to all delay thence ensuing have been on demurrage, and the charterer would have been obliged to pay for such delay in the amount stipulated in the contract, and this would have been fair and just to each of the parties.

There was some effort in the cross-examination of the agent of the Chesapeake & Ohio Railroad to show that the railroad would not allow a vessel to berth at the piers for part of the cargo for which she was registered; but it was also shown that this rule could be avoided, as it was avoided in the case of the Valtellina, by the cancellation by the charterer of the vessel's registry and her re-registry for the amount of the coal then on hand, and in this way, if the offer for part cargo had been accepted, the charter party would have been carried into effect, and the ship would have received the stipulated compensation, and the loss from delay would have fallen where it should have fallen—on the charterer.

I can think of no justifiable excuse for this action on the part of the respective masters of the vessels, except the purpose on

their part to take advantage of the embarrassment of the charterer to cancel the contract, in order that the vessels' owner might avail of the increasing freight rates, which the demand for vessels at this particular moment had brought about. The contract by its very terms contemplated the possibility of loading part cargo, and specifically provided in that case the release of the charterer from demurrage for subsequent delay from any cause should not apply. It is fundamental, I think, that it was the duty of each party to the contract to do everything that could reasonably be done to carry it into effect, and equally a duty on the part of each to take all reasonable measures to diminish the loss. If the docking and undocking had involved expense to the steamer, the position of the captain would have been better understood; but the offer to load part cargo was conditioned (in the one case specifically and in the other impliedly) upon the payment of this expense by the charterer. It could have been a matter of no concern to the master whether his ship was in dock or in stream, so long as no cost to him was involved in the transfer from one to the other; but the master understood, of course, that under the terms of the contract, if he accepted any coal, his option to cancel would have passed, and, since he saw ready at hand a new charter at an increased rate, he took the arbitrary position, and, in my opinion, the unjust position, that he would not accept part cargo and wait on demurrage for a reasonable time until full cargo should arrive. He knew in each instance that a considerable part of the cargo was then rolling and would be at the piers in a few days, and that the charterer's contract ultimately would be fully met. The refusal of the master was a breach of the contract, and the vessels should not thereafter be permitted to claim the benefit of its provisions against the charterer.

What has been already said very largely disposes of the claim of the master of the Valtellina that he was induced to cancel by reason of the letter sent to him by the charterer the day after he had reported ready to load. The language of the letter was a notification of a partial embargo which was then existing on the railway. The letters and telegrams filed as exhibits with the evidence, and passing between the master and his owners abroad, completely negative the idea that the cancellation was brought about as a result of this letter. The matter was considered by the master of the vessel and his agents in Norfolk purely from a legal point of view. If the cancellation could be

legally made, the vessel stood to double her earnings for the voyage. It was that consideration, and nothing that was said or done by the charterer, that induced the cancellation.

In both cases, therefore, a decree should be entered for the libelant.